IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 12, 2022

**STATE OF TENNESSEE v. DEMERRICK PORTER**

**Appeal from the Criminal Court for Shelby County**
**No. C1810060/18-06890    Paula L. Skahan, Judge**

_____

**No. W2021-01216-CCA-R3-CD**

_____

The Defendant, Demerrick Porter, was convicted in the Shelby County Criminal Court of second degree murder, attempted second degree murder, and employing a firearm during the commission of a dangerous felony and received an effective sentence of thirty-eight years in confinement. On appeal, the Defendant contends that the evidence is insufficient to support his convictions of second degree murder and attempted second degree murder. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Paul K. Guibao (on appeal and at trial) and Ernest Beasley (at trial), Memphis, Tennessee, for the appellant, Demerrick Porter.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stephen Ragland and Jennifer Morris, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In November 2018, the Shelby County Grand Jury indicted Jaelen Bell, Christian Key, and the Defendant for the second degree murder of Christopher Smith, the attempted second degree murder of Collin Anderson, and employing a firearm during the commission of a dangerous felony. The Defendant was tried separately from his codefendants in July 2021.

At trial, Carlos Smith testified that she was Christopher Smith's mother.[1]  She said that prior to the night of March 28, 2018, her son was in "excellent condition" and that he was "getting ready to go to work."  Ms. Smith identified a photograph of her son for the jury.

Collin Anderson testified that on the night of March 28, 2018, he drove to the Shell gas station at the corner of Shelby Drive and Riverdale Road and went into the store.  When he came outside, his car had been stolen.  Anderson telephoned the police, and the police came to the gas station and took a report.  Anderson also telephoned his cousin, Christopher Smith, because Anderson needed a ride home.  After Smith arrived at the Shell station, he and Anderson were standing outside when Anderson saw a "suspicious vehicle" drive through the parking lot.  Anderson said that he did not see any faces in the vehicle, which was a gray Honda Accord, but that he saw "heads turn, look directly at us."  The Honda left the parking lot, drove to the gas station across the street from the Shell station, and backed into a parking space.

Anderson testified that he thought the Honda had something to do with his stolen car and that he and Smith got into Smith's car.  Smith was driving, and Anderson was sitting in the passenger seat.  The Honda left the gas station and pulled onto Shelby Drive, and Smith followed the Honda so that Anderson could "get a license plate number or something."  Anderson said that he did not have his cellular telephone with him because it was in his stolen car and that he was unable to get the Honda's license plate number because "[e]verything happened so fast."

Anderson testified that the Honda made a U-turn on Shelby Drive and that Smith also made a U-turn.  The Honda turned right onto Riverdale Road, turned left into a neighborhood, and turned left onto Cognac Cove.  Smith continued following the Honda but did not chase the vehicle.  The Honda circled at the end of Cognac Cove, and the Honda and Smith's car ended up facing each other.  Anderson said that the two cars were ten to fifteen feet apart, that three men got out of the Honda, and that he told Smith "to go."  However, "[i]t was too late."  Anderson heard gunshots and saw gun muzzles flashing.  He estimated that he saw ten to twenty flashes and acknowledged that he heard ten to fifteen gunshots.  Neither he nor Smith was armed.

Anderson testified that he "ducked" and kept telling Smith "to go" but that Smith was not moving.  Anderson got out of Smith's car and ran.  Anderson was shot in his right leg as soon as he got out of the car, and a bullet grazed his left leg.  He continued running,

---

[1] Because there are two victims in this case, we will refer to each by name.

and a neighbor telephoned the police. Anderson identified a video of the shooting, and the State played the video for the jury.[2]

At the conclusion of Anderson's direct testimony, the State asked if Smith's car had been "blocking" the Honda prior to the shooting. Anderson said that the Honda had "enough room" to leave Cognac Cove and that neither he nor Smith ever got out of Smith's car to confront the people in the Honda.

On cross-examination, Anderson acknowledged that he did not witness his car being stolen and that he was upset about his car when he saw the Honda in the Shell parking lot. Anderson became suspicious of the Honda because the Honda's occupants looked at him and Smith. Anderson could not see the occupants' faces, and the occupants did not make any threats or show any gang signs. Anderson acknowledged that he and Smith were "in pursuit" of the Honda to get the Honda's license tag number but denied that Smith was speeding when Smith turned onto Cognac Cove. Anderson never got the Honda's license plate number and never called the police to report the suspicious vehicle.

Sergeant Marcus Smith of the Memphis Police Department ("MPD") testified that he went to Cognac Cove on the night of March 28, 2018, to photograph the scene and collect evidence. A car was present. The engine appeared to be "running," and bullet holes appeared to be in the windshield. The car's passenger door was open, a cellular telephone was on the road behind the car, and numerous shell casings were on the road. Sergeant Smith did not find any weapons in the car.

On cross-examination, Sergeant Smith testified that he collected fifteen .223 caliber shell casings, four .40 caliber shell casings, and four 9mm shell casings. He acknowledged that a .223 caliber shell casing generally was fired from a rifle and that .40 caliber and 9mm shell casings generally were fired from pistols.

Officer Brandon Marcum of the MPD testified that he was a uniformed patrol officer in the Whitehaven community. On the night of April 12, 2018, Officer Marcum and his partner were dispatched to a suspicious vehicle call at Dodge's Store on Elvis Presley Boulevard. When they arrived, the suspicious vehicle was still present, and five people were in the vehicle. Officer Marcum said that as he and his partner approached the vehicle, "people began to start fleeing." The driver of the vehicle tried to flee, but Officer Marcum's partner was able to detain the driver, who was the Defendant. Officer Marcum told the

---

[2] Although the video was introduced into evidence at trial, the record on appeal does not include the video. We note that it is the appellant's duty to prepare a fair, accurate, and complete record on appeal to enable this court to conduct a meaningful review. *See* Tenn. R. App. P. 24(b). The State notes in its brief that the video is absent from the record but does not argue that the record is inadequate for our review.

Defendant to calm down, and the Defendant responded, "[Y]ou don't understand. I'm wanted for murder." Officer Marcum identified the Defendant in the courtroom.

Sergeant Fausto Frias of the MPD testified that he was the lead investigator in this case and that he responded to the scene of the shooting, which he described as "a cove." The street lights were on, and a dark-colored Nissan was in gear and was against the curb next to a mailbox. A person inside the car appeared to have died from gunshot wounds. A homeowner's video camera recorded the shooting, and the police found a cellular telephone at the scene. A search warrant for the telephone revealed that it belonged to Jaelen Bell. Bell later identified two people who were with him at the time of the shooting: the Defendant and Christian Key. On the morning of April 13, 2018, Sergeant Frias was notified that the Defendant had been arrested. Sergeant Frias went to the police department and read an Advice of Rights form to the Defendant. The Defendant waived his rights, and Sergeant Frias interviewed him.

Sergeant Frias testified that during the Defendant's interview, the Defendant stated that he was with Bell and Key in a gray Honda Accord on the night of the March 28, 2018. Bell was the driver, the Defendant was sitting in the front passenger seat, and Key was in the back seat. Detective Frias asked the Defendant to tell him what happened, and the Defendant stated as follows:

> The car started following us from the Marathon gas station at Shelby Drive and Riverdale. They almost hit us on the lot at the gas station. Then we tried to lose them and they kept following us. Then we went into a cove and that is when the car blocked us[.] [T]he front passenger door swung [open]. Then I heard gun shots and I started shooting.

The Defendant stated that the other car was a black Nissan and that he was shooting in the direction of the Nissan. Sergeant Frias asked if anyone in the Nissan shot at the Defendant and his friends, if anyone in the Nissan was armed with a weapon, and if anyone in the Nissan said anything before the shooting. The Defendant answered all three questions in the negative. The Defendant said he was about twenty yards from the Nissan at the time of the shooting. He stated that he had a 9mm weapon, that Bell had a .223 caliber weapon, and that Key had a .40 caliber weapon. The Defendant told Sergeant Frias that Bell dropped Bell's cellular telephone at the scene and that the shooting was not gang-related.

On cross-examination, Sergeant Frias acknowledged that the video of the shooting showed the Honda and the Nissan entering the cove at "a fairly quick pace." During the Defendant's interview, the Defendant claimed that the Nissan almost hit the Honda at the gas station and that the Nissan was following the Honda. Sergeant Frias acknowledged

- 4 -

that the Nissan was not against the curb at the time of the shooting and that the Nissan ended up against the curb after the shooting.

Dr. Marco Ross, the Medical Examiner for Shelby County, testified as an expert in forensic pathology, that he performed Christopher Smith's autopsy. Smith had two gunshot wounds to the head. One bullet entered the top of his head and traveled through his skull and into his brain. The second bullet entered toward the back of his head. One part of the bullet went into his skull and brain, and the other part of the bullet traveled along his scalp. Dr. Ross noticed "pseudo stippling" on Smith's face and forehead. Dr. Ross explained that pseudo stippling occurred when a a bullet passed through an intermediate target and the fragments of the intermediate target were left on the skin. He acknowledged that the intermediate target in this case could have been a windshield. Dr. Ross concluded that Smith's cause of death was gunshot wounds to the head and that his manner of death was homicide. On cross-examination, Dr. Ross acknowledged that he was unable to determine the caliber of the bullets that caused Smith's injuries.

At the conclusion of Dr. Ross's testimony, the State rested its case. The Defendant did not present any proof, and the jury convicted him as charged in the indictment of second degree murder, attempted second degree murder, and employing a firearm during the commission of second degree murder. After a sentencing hearing, the trial court sentenced the Defendant to twenty-two years for second degree murder, a Class A felony; ten years for attempted second degree murder, a Class B felony; and six years for employing a firearm during the commission of a dangerous felony, a Class C felony. The trial court ordered that the Defendant serve the sentences consecutively for a total effective sentence of thirty-eight years.

## ANALYSIS

The Defendant claims that the evidence is insufficient to support his convictions of second degree murder and attempted second degree murder. He acknowledges shooting at the victims but asserts that he did so "based on a perceived threat." The State argues that the evidence is sufficient. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a result-of-conduct offense. *See State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). As instructed to the jury in this case, attempt requires that the Defendant act with the intent to cause the knowing killing of another and "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the [Defendant's] part." Tenn. Code Ann. § 39-12-101(a)(2). "Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence." *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000).

Taken in the light most favorable to the State, the evidence shows that on the night of March 28, 2018, someone stole Collin Anderson's car from the Shell gas station at the corner of Riverdale Road and Shelby Drive. When Anderson's cousin, Christopher Smith, arrived at the gas station to pick up Anderson, they saw a gray Honda driving through the parking lot. The occupants of the Honda looked at Smith and Anderson, causing Anderson to think they had something to do with stealing his car. Smith and Anderson got into Smith's Nissan and began following the Honda to get the Honda's license plate number. Jaelen Bell, who was driving the Honda, tried to "lose" the Nissan but was unable to do so, and the Honda ended up facing the Nissan on Cognac Cove. At that point, Bell, the Defendant, and Christian Key got out of the Honda and began shooting at the Nissan. They fired at least twenty-four gunshots at the car, including the windshield, striking Smith in

the head and striking Anderson in his legs when he got out of the Nissan and fled. The Defendant himself fired at least four gunshots. He later gave a statement to the police in which he said that the victims were unarmed and that they did not threaten anyone in the Honda. Sergeant Frias testified that he did not find any weapons in the Nissan.

The jury instructions reflect that the trial court instructed the jury on criminal responsibility. *See* Tenn. Code Ann. §§ 39-11-401(a), -402(2). From the facts, the jury could have concluded that even if one of the Defendant's bullets did not strike Smith or Anderson, the Defendant nevertheless was criminally responsible for Smith's death and Anderson's injuries. The trial court also instructed the jury on self-defense. *See* Tenn. Code Ann. § 39-11-611(b)(1). However, given that the victims were unarmed and did not physically or verbally threaten anyone in the Honda, the jury reasonably rejected the Defendant's self-defense claim. Accordingly, we conclude that the evidence is sufficient to support the Defendant's convictions of second degree murder and attempted second degree murder.

## CONCLUSION

After review, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE